An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the *North Carolina Rules of Appellate Procedure*.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-961

Filed 3 June 2026

Stanly County, Nos. 24JT001109-830, 24JT001110-830

IN THE MATTER OF: R.A.J.W., T.R.R.W.

Appeal by Respondent-Mother from orders entered 4 November 2024 and 8 July 2025 by Judge T. Thai Vang in Stanly County District Court. Heard in the Court of Appeals 19 May 2026.

> *Parent Defender Annick Lenoir-Peek, by Assistant Parent Defender Jacky L. Brammer, for respondent-appellant mother.*
>
> *Valeree R. Adams, for petitioner-appellee Stanly County Department of Social Services.*
>
> *No brief filed on behalf of petitioner-appellee Guardian Ad Litem.*

STADING, Judge.

Respondent-Mother ("Mother") appeals from the trial court's orders regarding permanency planning and termination of parental rights to her children, Ryan and Tracy.[1] On appeal, Mother contends the trial court erred in finding that Petitioner Stanly County Department of Social Services ("DSS") provided reasonable efforts through the permanency planning hearing. Additionally, Mother contends the trial

---

[1] We use pseudonyms to protect the identity of minor children. *See* N.C. R. App. P. 42(b).

court erred in failing to provide Mother with a proper visitation framework. For the reasons below, we disagree and affirm the trial court's orders.

## I.    Background

Since 2020, Mother and her children have primarily resided in Stanly County. After defaulting on rent payments, however, the family left their Stanly County home and travelled to Pennsylvania, where their relatives resided. The family left Pennsylvania after a physical altercation involving their maternal uncle, the children, and the children's father.[2] Upon returning to Stanly County, the family temporarily stayed at various hotels but were asked to leave.

Around 29 June 2023, DSS became involved with Mother and her children after receiving reports of improper care and supervision, mental health issues, and lack of housing. At the time, the family was experiencing housing instability, both children were developmentally and cognitively delayed, and Mother struggled with bipolar disorder and substance abuse. Mother's children, Ryan and Tracy were four and three years old, respectively. Ryan was diagnosed with autism, tended to bite himself and scream. While undiagnosed, Tracy displayed symptoms indicative of special needs. Neither child was verbal or toilet-trained.

After becoming involved, a social worker arranged for the family to stay at a hotel. Mother became visibly upset and angry upon learning her dog was not allowed

---

[2] This appeal only concerns Mother.

at the hotel. Upon learning this news, DSS reported that Mother ripped out four handfuls of hair, threatened suicide, produced a bottle of alcohol and began drinking it. According to DSS, "[M]other appeared unable to comprehend that the dog [was] not a 'service animal[.]'"[3] The dog was later relinquished in the presence of law enforcement.

While working with the family, DSS received additional reports of financial mismanagement, substance abuse, domestic violence concerns, and unexplained bruises on the children. DSS also received a report that Mother was engaging in the use of methamphetamines and marijuana. Mother admitted using marijuana but did not provide a sufficient sample for drug screening purposes. With respect to the children, Ryan had bruises on his hairline and thigh, while Tracy was observed to have bruises on her cheek and temple consistent with finger and thumb marks. Based on this, DSS filed a juvenile petition on 29 August 2023.

DSS obtained nonsecure custody of the children who were placed with maternal relatives, and adjudicated neglected. Mother, along with the children's father, were permitted to reside with the children. During this placement, Mother reported she and her children were being abused. While unsubstantiated, Mother recounted being threatened with a gun, her children being endangered, and being forced to leave the children alone. After making these unsubstantiated accusations,

---

[3] An "emotional support animal" is not necessarily a "service animal," which receives certain rights. *See* N.C. Gen. Stat. § 168-4.2 (2025).

Mother was asked to leave, which she did with the assistance of law enforcement. Thereafter, Mother overdosed and was hospitalized for one week. DSS reported Mother would call to speak with the children but would make allegations against placement providers. The placement providers no longer wanted to be involved with Mother during phone calls.

On 26 February 2024, the children were transferred into foster care. At a hearing on 2 May 2024, the trial court found that, after her overdose, Mother stayed at a shelter before being hospitalized again for suicidal ideations and discharged due to making allegations about other staff and residents. Mother thereafter resided at a Salvation Army shelter. According to DSS, while Mother had video calls when she was available, in-person visitations were not regularly occurring given Mother's "recent hospitalizations, substance use issues and lack of transportation." The trial court noted that coordinating in-person visitations took almost a full day, and ordered in-person visitation as follows:

> The parents shall have visitation in person a minimal of one time per month for two hours, supervised by the Department or its designee[.] The visits for each child and the parents may be together or separate, however, the siblings shall visit each other at least one time per month[.] The parents are responsible for arranging transportation to the Department for visits[.] If the parents [cannot] arrange transportation, then virtual visits will be offered[.] In addition to in-person visits, the parents shall have virtual visits with each child at least weekly, supervised by the placement provider or Department[.]

After the 2 May 2024 hearing, DSS learned that Mother had left the Salvation Army shelter after becoming upset that she was not permitted to sleep with the children's father. Despite reporting that she remained at the shelter, Mother had only resided there for eighteen days. Mother and the children's father then resided in a tent encampment.

On 19 September 2024, the trial court conducted another hearing. Neither Mother nor the children's father appeared in court for the hearing. The trial court found that DSS attempted to coordinate transportation; however, Mother stated she would not appear without her dog. In denying the motions to continue, the trial court found that Mother "does not report the dog is trained to do any specific tasks, but rather that [it] is an emotional support dog. Such an animal [cannot] be transported in the county vehicle nor enter the courthouse." At the conclusion of the hearing, the trial court ceased reunification efforts and established a primary plan of adoption with a concurrent plan of guardianship. The trial court ordered visitation as follows:

> The parents shall have visitation in person one time per month supervised by the Department. The visits for each child and the parents may be together or separate. The parents are responsible for arranging transportation to the Department for visits. If the parents [cannot] arrange transportation, then virtual visits will be offered.

After the 19 September 2024 hearing, Mother visited once and sporadically called her children. Virtual visits were decreased given Mother's inability to

consistently attend video calls. On 18 December 2024, DSS filed petitions seeking termination of Mother's parental rights.

The trial court held a termination hearing. While DSS provided transportation to this hearing, Mother testified that she had frequent difficulty with transportation and housing and that DSS would not adequately help. DSS provided testimony that Mother initially failed drug screens but would not provide drug screens anymore, was not taking medication or participating in therapy, had a previous Pennsylvania order terminating her parental rights to a child, and was living with a man she had recently met. The trial court concluded that multiple termination grounds existed and that termination of Mother's parental rights was in the children's best interest. Mother appeals from the permanency planning order eliminating reunification and the order terminating her parental rights.

## II. Analysis

Mother contends that DSS did not provide reasonable efforts. *See* N.C. Gen. Stat. §§ 7B-903(a3), -906.1(e)(5) (2025). Mother maintains DSS was unhelpful when she needed consideration of her emotional support dog for her past trauma, help with transportation, and help with housing. Additionally, with respect to the 4 November 2024 permanency planning order, Mother contends the trial court failed to provide a visitation framework with a minimum duration of the visits as it cannot delegate the judicial function of determining the length of visits to a third party. *See* N.C. Gen. Stat. § 7B-905.1(a), (b) (2025). On these grounds, Mother seeks to have the

permanency planning order and resulting termination order reversed. We consider each challenge in turn.

## A.    Reasonable Efforts

Mother asserts that "DSS did not provide reasonable efforts to help [her] transportation and housing needs." Consequently, Mother maintains that "the findings must be struck, and the orders must be reversed." We disagree.

Mother challenges the trial court's findings that DSS provided reasonable efforts including "transportation assistance" and housing. The 4 November 2024 permanency planning order provided the following finding:

> The Stanly County Department of Social Services has made reasonable efforts to eliminate the need for placement, as well as to implement the permanent plan, including: Case Management Services; referrals for parenting courses; providing parenting reading material; DNA testing; Referral for services; kinship assessments, drug screens, case plans; foster placement; services for children including assessments and arranging higher level of care; referrals for substance abuse treatment; referrals for mental health treatment; referrals to programs in Cabarrus county; and transportation assistance.

While listed as a finding of fact, "[a] reasonable efforts determination is a conclusion of law because it 'require[s] the exercise of judgment.' " *In re N.L.M.*, 283 N.C. App. 356, 360, 873 S.E.2d 640, 643 (2022) (citing *In re Helms*, 127 N.C. App. 505, 510–11, 491 S.E.2d 672, 676 (1997)) (alteration in original); *see also In re H.P.*, 278 N.C. App. 195, 205–08, 862 S.E.2d 858, 867–69 (2021). "We note that, if a finding of fact is essentially a conclusion of law it will be treated as a conclusion of law which is

reviewable on appeal." *In re M.R.D.C.*, 166 N.C. App. at 697, 603 S.E.2d at 893 (cleaned up). "The trial court's conclusions of law are reviewable *de novo* on appeal." *In re D.H.*, 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006) (citation and internal quotation marks omitted). Our review of a trial court's conclusion of law is limited to whether they are supported by the findings of fact." *In re N.L.M.*, 283 N.C. App. at 360, 873 S.E.2d at 643 (citations omitted).

"Our General Assembly requires social service agencies to undertake reasonable, not exhaustive, efforts towards reunification." *In re: A.A.S, A.A.A.T., J.A.W.*, 258 N.C. App. 422, 430, 812 S.E.2d 875, 882 (2018). "Reasonable efforts" is defined as:

> [t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time. If a court of competent jurisdiction determines that the juvenile is not to be returned home, then reasonable efforts means the diligent and timely use of permanency planning services by a department of social services to develop and implement a permanent plan for the juvenile.

N.C. Gen. Stat. § 7B-101(18) (2025). While our statutes do not include a definitive list of the services which may be provided as a part of reasonable efforts, there is a

> a federal regulation setting forth a nonexclusive list of services which *may* satisfy the "reasonable efforts" requirement. 45 C.F.R. § 1357.15(e)(2) (1996) (*i.e.*, crisis counseling, individual and family counseling, services to unmarried parents, mental health counseling, drug and alcohol abuse counseling, homemaker services, day care,

emergency shelters, vocational counseling, emergency caretaker, and "other services which the agency identifies as necessary and appropriate").

*In re D.M.*, 211 N.C. App. 382, 386, 712 S.E.2d 355, 357 (2011) (citing *In re Helms*,

127 N.C. App. at 512 n.3, 491 S.E.2d at 677 n.3); *see also In re N.L.M.*, 283 N.C. App.

at 361, 873 S.E.2d at 644.

### 1. *Transportation Assistance*

With respect to transportation assistance, the trial court made the following

findings of fact:

> 2. . . . Over the lunch recess today, [a social worker and an attorney's office] attempted to coordinate to assist parents with transportation. [The social worker] was able to make contact with the mother to offer transportation for Court. [Mother] reported [to the social worker and her attorney's office] that she was not coming to court without her dog. . . .
>
> [13]b. . . . The parents have been observed to use Uber and Lyft for transportation[,] which can be pricey. They have been advised to use SCUSA[4] or an equivalent transportation program in Cabarrus county for medical and mental health appointments. . . .

---

[4] Per the Stanly County website:

> SCUSA provides community transportation services responsive to the current and changing needs of Stanly County residents. Transportation includes trips to and from agencies, employment sites, businesses, medical centers (in and out of county), community college, Senior Center, nutrition sites, dialysis, nursing homes, daycares, etc. Services are provided utilizing vans and buses through subscription and demand response routes.

Stanly County, https://www.stanlycountync.gov/310/Transportation (last visited 27 May 2026).

> [13]f. . . . The parents have been provided with lists of resources in Cabarrus county, including assistance with transportation.

Here, we conclude these findings of fact support the trial court's determination that DSS used reasonable efforts with respect to transportation assistance. *See In re N.L.M.*, 283 N.C. App. at 360, 873 S.E.2d at 643. Indeed, with respect to transportation and Mother's dog, DSS is required to undertake reasonable—not exhaustive—efforts. *See In re: A.A.S*, 258 N.C. App. at 430, 812 S.E.2d at 882. To the extent that Mother challenges these findings of fact supporting the trial court's reasonable efforts determination, we review "whether the findings of fact are supported by clear and convincing evidence." *In re H.P.*, 278 N.C. App. at 201, 862 S.E.2d at 865.

Our review of the record reveals the trial court's findings of fact are supported. The record demonstrates that DSS offered transportation or directed Mother to transportation resources. For instance, DSS offered transportation to court. Likewise, Kathy LeFloch, the foster care supervisor, testified that DSS would offer transportation to drug screenings. Additionally, Ms. LeFloch mentioned that SCUSA or a Carrabus County equivalent would also assist with transportation for medical appointments. Accordingly, after reviewing the record, we discern no error as to the trial court's findings of fact and reasonable efforts determination with respect to transportation assistance.

### 2. *Housing*

Next, Mother claims DSS did not make reasonable efforts as it relates to housing. To this point, the 4 November 2024 permanency planning order made the following findings of fact:

> 13. . . . The components of their plan include housing[.] . . . [A]t the last [2 May 2024] hearing, [Mother] reported residing in the Salvation [A]rmy shelter in Concord. In speaking with the shelter manager in June, [a social worker] was informed that [Mother] left the shelter in early February and had only stayed there a total of 18 days. Shelter staff explained that [Mother] became upset when she and [the children's father] were not permitted to sleep together. . . . As late as June 10, 2024, [Mother] continued to report to Department staff that she was at the shelter.
>
> [Mother] was working with Continuum Care on a plan for housing. [Mother] received an exit letter due to non-cooperation. The program is within walking distance of the shelter where [Mother] reported she was staying.
>
> The parents are currently staying in a tent camp, approximately 20 minutes from the shelter in Concord. . . .
>
> [13]f. . . . The Opportunity House is within walking distance of the camp where the parents stay and offers showers, and online access to take classes and look for jobs. . . .
>
> 14. . . . The parents are homeless, and not taking advantage of programs designed to assist with this issue.

Likewise, the record discloses DSS made housing efforts for Mother. In the beginning, DSS arranged for the family to stay at a hotel. Next, Mother was permitted to reside with the children in the home of temporary safety providers, until

being asked to leave after making unsubstantiated accusations. Additionally, Mother stayed at a domestic violence shelter before being hospitalized,[5] where she was then discharged due to making allegations about other staff and residents. From there, Mother resided at a Salvation Army shelter, where she also began participating in substance abuse treatment. Mother was ultimately "discharged from that program due to mental health and not wanting to participate[.]" Likewise, Mother left Salvation Army on her own volition, despite reporting to DSS she was still there.

Nevertheless, DSS made referrals for mental health and substance use services. For instance, "[Mother] was referred to an inpatient substance abuse treatment, but declined to enter the [ ] program because they do not take couples." Mother was also referred to "Will's Place for treatment but she was informed that most places do not take couples." A social worker also provided Mother with information about a treatment program in Raleigh, as well as a list of free inpatient substance abuse facilities. Notably, an inpatient program would have provided Mother housing as well as drug and alcohol abuse counseling. *See In re Helms*, 127 N.C. App. at 512 n.3, 491 S.E.2d at 677 n.3.

DSS also provided Mother with a list of housing resources for Stanly County and Cabarrus County. The record reveals DSS coordinated with other organizations in assisting with housing and transportation. Despite these efforts, Mother contends

---

[5] Mother was hospitalized multiple times for varying reasons over the course of her involvement with DSS, including overdose, suicidal ideations, and chronic intestinal pain.

DSS did not make reasonable efforts because the DSS housing list was "useless." *See In re S.D.*, 276 N.C. App. 309, 322, 857 S.E.2d 332, 342 (2021). Mother argues the DSS housing list was insufficient because of long waiting lists, her lack of funds, and criminal history. In *In re S.D.*, DSS gave "limited assistance" to the mother for the purpose of finding housing. *See id.* This limited assistance consisted of handing her an unvetted list of addresses produced by a third party and directing her to the Housing Authority with its three-year waiting list." *Id.* The court stated that "[b]oth suggestions proved useless." *Id.*

Unlike *In re S.D.*, however, the record does not demonstrate useless efforts. Instead, the record demonstrates that DSS offered hotels, referrals, and directed Mother to shelters. The record reveals Mother actually resided at different shelters but nevertheless left on her own volition. Likewise, the record reveals DSS attempted to coordinate inpatient programs for Mother, which would also provide housing. With respect to the DSS housing list, Mother was placed on the Section 8 waitlist at the beginning of their involvement. Again, DSS is required to undertake reasonable—not exhaustive—efforts. *See In re: A.A.S*, 258 N.C. App. at 430, 812 S.E.2d at 882. In this case, "there is ample evidence in the record showing that DSS used reasonable efforts towards reunification." *Id.* (citation omitted); *see also In re: C.C.G.*, 380 N.C. 23, 36, 868 S.E.2d 38, 47 (2022) ("Respondent also has not shown that even if an error occurred, such error was material and prejudicial."). Accordingly, we affirm the trial court's reasonable efforts determination.

### B. Visitation

Mother contends the trial court erred by failing to include a minimum length of time for in-person visitation or a framework for her virtual visitation. In doing so, Mother maintains the trial court improperly delegated its authority.

"We review disposition orders, including visitation determinations, for abuse of discretion. When reviewing for abuse of discretion, we defer to the trial court's judgment and overturn it only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *In re J.C.*, 283 N.C. App. 486, 489, 873 S.E.2d 757, 761 (2022) (citations omitted). "[T]o obtain relief on appeal, an appellant must not only show error, but that . . . the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action." *In re C.C.G.*, 380 N.C. at 32, 868 S.E.2d at 45 (quoting *In re L.R.L.B.*, 377 N.C. 311, 326, 857 S.E.2d 105, 118 (2021)).

With respect to visitation, our statutes provide:

> If the juvenile is placed or continued in the custody or guardianship of a relative or other suitable person, any order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised. The court may authorize additional visitation as agreed upon by the respondent and custodian or guardian.

N.C. Gen. Stat. § 7B-905.1(c) (2025). "Thus, the trial court must include three pieces of information when ordering visitation: (1) minimum frequency; (2) length of the

visits; and (3) supervision, or lack thereof, necessary for the visits." *In re K.B.*, 290 N.C. App. 61, 69, 891 S.E.2d 479, 485 (2023), *aff'd*, 386 N.C. 68, 900 S.E.2d 759 (2024).

Here, the 4 November 2024 permanency planning order provided visitation as follows:

> The parents shall have visitation in person one time per month supervised by the Department. The visits for each child and the parents may be together or separate. The parents are responsible for arranging transportation to the Department for visits. If the parents [cannot] arrange transportation, then virtual visits will be offered.

While the 4 November 2024 permanency planning order does not include the length of time for visitations, Mother has not shown that any such error "was material and prejudicial." *In re C.C.G.*, 380 N.C. at 36, 868 S.E.2d at 47. Indeed, after the order was entered, Mother visited her children only once and called them sporadically. Further, the order's visitation provision did not hinder Mother's contact with her children; our review of the record shows any hindrance was attributable to her own actions. Ultimately, while the trial court later found Mother did not consistently visit her children, the trial court terminated her parental rights under N.C. Gen. Stat. § 7B-1111(a)(1), (2), (6), and (9). Since Mother has not shown material and prejudicial error, we affirm visitation provisions in the order.

## III. Conclusion

For the reasons set forth above, we affirm the 4 November 2024 permanency planning order and the resulting 8 July 2025 termination of parental rights order.

AFFIRMED.

Chief Judge DILLON and Judge GORE concur.

Report per Rule 30(e).